1
2
3
4
5
6
7
8
9
10

**VALLE MAKOFF LLP**
JEFFREY B. VALLE (SBN 110060)
 jvalle@vallemakoff.com
DAVID S. SHUKAN (SBN 143683)
 dshukan@vallemakoff.com
ILAN WISNIA (SBN 249137)
 iwisnia@vallemakoff.com
11777 San Vicente Blvd., Suite 890
Los Angeles, California 90049
Telephone:    (310) 476-0300
Facsimile:(310) 476-0333

Attorneys for Plaintiff
ClipBandits, LLC

11
12

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| CLIPBANDITS, LLC,<br><br>                Plaintiff,<br><br>        v.<br><br>K & SODA, LLC d/b/a 818 SPIRITS,<br><br>                Defendant. | Case No. 2:22-CV-01071-SVW-JEM<br><br>Hon. Stephen V. Wilson<br><br>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT<br><br>**<u>Hearing</u>**<br>DATE: October 31, 2022<br>TIME: 1:30 pm<br>CTRM: 10A<br><br>Action Filed: February 16, 2022<br>Trial Date: December 6, 2022 |

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

PRELIMINARY STATEMENT ..........................................................1

STATEMENT OF FACTS ................................................................2

      A.     The Tequila 512 Trademark and Trade Dress ................................2

      B.     Tequila 512's Markets .............................................................4

      C.     818 Tequila's Infringement.......................................................5

      D.     Marketplace Confusion ...........................................................6

ARGUMENT...............................................................................6

1.     Summary Judgment Is Disfavored In Trademark Cases
       Because Likelihood Of Confusion Is A Highly Factual
       And Subjective Question..........................................................7

2.     Summary Judgment Should Be Denied Because The *Sleekcraft*
       Factors All Favor Plaintiff, Or At A Minimum Are Riddled
       With Factual Issues Requiring A Jury To Decide The Issue
       Of Likelihood Of Confusion ......................................................7

      A.     Defendant Concedes, As It Must, That 3 Of The 8
           *Sleekcraft* Factors – Proximity Of Goods, Marketing
           And Distribution Channels, And Likelihood Of Expansion
           Of Product Lines – Factually Favor Plaintiff..................................7

      B.     The "Similarity Of The Marks" Factor Also Favors
           Plaintiff, Or At Least Raises Factual Issues To Be
           Decided By A Jury ..................................................................8

      C.     The "Actual Confusion" Factor Also Favors Plaintiff,
           Or At Least Raises Factual Issues To Be Decided By
           A Jury ................................................................................11

      D.     The "Strength Of The Mark" Factor Also Favors
           Plaintiff, Or At Least Raises Factual Issues To Be
           Decided By A Jury ................................................................16

E.    The "Sophistication Of Purchasers" Factor Also
      Favors Plaintiff, Or At Least Raises Factual Issues
      To Be Decided By A Jury ................................................................ 21

F.    The "Defendant's Intent" Factor Is Neutral, And After
      Discovery Might Favor Plaintiff (But On Summary
      Judgment Cannot Favor Defendant) .............................................. 23

CONCLUSION ..................................................................................................... 25

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

Page

**Cases**

*All. for Good Gov't v. Coal. for Better Gov't*
  901 F.3d 498 (5th Cir. 2018) ...................................................................23

*American Technical Industries, Inc. v. General Foam Plastics Corp.*
  200 U.S.P.Q. 244, 1978 WL 21727 at *3 (S.D.N.Y.1978) ..................................10

*AMF Inc. v. Sleekcraft Boats*
  599 F.2d 341 (9th Cir. 1979) ...........................................2, 7, 8, 16, 21, 24

*Brookfield Commc'n Inc. v. W. Coast Ent. Corp.*
  174 F.3d 1036 (9th Cir. 1999) .............................................................11

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
  251 F.3d 1252 (9th Cir. 2001) .............................................................25

*CytoSport, Inc. v. Vital Pharm., Inc.*
  617 F. Supp. 2d 1051 (E.D. Cal. 2009) .....................................................23

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*
  109 F.3d 275 (6th Cir. 1997) ..............................................................24

*E. & J. Gallo Winery v. Gallo Cattle Co.*
  967 F.2d 1280 (9th Cir. 1992) .........................................................22, 23

*Entrepreneur Media, Inc. v. Smith*
  279 F.3d 1135 (9th Cir. 2002) .............................................................25

*Facegym, Ltd v. Skin Gym Inc.*
  2021 WL 4893273, at *1-*2 (C.D. Cal. 2021) ................................................25

*First Brands Corp. v. Fred Meyer, Inc.*
  809 F.2d 1378 (9th Cir. 1987) .............................................................20

*George Sink, P.A. Inj. Lawyers v. George Sink II L. Firm,* LLC
  407 F. Supp. 3d 539 (D.S.C. 2019).........................................................18

*Globefill Inc. v. Elements Spirits, Inc.*
  2013 WL 12109779 (C.D. Cal. 2013) ........................................................22

*Hancock v. American Steel & Wire Co. of New Jersey*
  203 F.2d 737 (C.C.P.A. 1953) .............................................................10

*In re Forney Indus.*
  955 F.3d 940 (Fed. Cir. 2020)...................................................................19

*In Re Medline Indus., Inc.*, No. 87680078
  2020 WL 1485709, at *16 (Mar. 25, 2020)..........................................11

*In re Servotronics, Inc.*
  156 U.S.P.Q. 592 (T.T.A.B.1968) .........................................................19

*In re W.B. Roddenbery Co.*
  135 U.S.P.Q. 215 (T.T.A.B.1962) .........................................................19

*JL Beverage Co., LLC v. Jim Beam Brands Co.*
  828 F.3d 1098 (9th Cir. 2016) ...............................................................25

*Jordache Enterprises, Inc. v. Levi Strauss & Co.*
  841 F. Supp. 506 (S.D.N.Y. 1993) ........................................................16

*K-Swiss, Inc. v. USA AISIQI Shoes Inc.*
  291 F. Supp. 2d 1116 (C.D. Cal. 2003) .................................................23

*Lanard Toys Ltd. v. Novelty Inc.*
  511 F.Supp.2d 1020 (C.D.Cal.2007) .....................................................20

*Las Vegas Sands Corp. v. Xian Sheng Chen*
  2020 Wil 3452620, at *3 (D.Nev. 2020) ...............................................23

*Michael Kors, LLC v. Chunma USA, Inc.*
  2018 WL 1426539, at *6 (C.D. Cal. Jan. 30, 2018) .............................16

*Nova Wines, Inc. v. Adler Fels Winery LLC*
  467 F.Supp.2d 965 (N.D.Cal. 2006) ................................................21, 23

*Official Airline Guides, Inc. v. Goss*
  6 F.3d 1385 (9th Cir.1993) ....................................................................21

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*
  578 F.3d 1154 (9th Cir. 2009) ...............................................................11

*Rearden LLC v. Rearden Com., Inc.*
  683 F.3d 1190 (9th Cir. 2012) .................................................................7

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*
  680 F. Supp. 2d 1107 (N.D. Cal. 2010)..................................................17

*Star Indus., Inc. v. Bacardi & Co.*
    412 F.3d 373 (2d Cir. 2005)...............................................................19, 22

*Thane Int'l, Inc. v. Trek Bicycle Corp.*
    305 F.3d 894 (9th Cir. 2002) .......................................................................25

*The Sherwin–Williams Company v. JP International Hardware, Inc.*
    988 F.Supp.2d 815 (N.D.Ohio 2013)..........................................................12

*Wynn Oil Co. v. Thomas*
    839 F.2d 1183 (6th Cir.1988) .......................................................................13

*YKK Corp. v. Jungwoo Zipper Co., Ltd.*
    213 F. Supp. 2d 1195 (C.D. Cal. 2002) .......................................................16

**Treatises**
*McCarthy on Trademarks and Unfair Competition* § 7:45 (5th ed.) ......................20

MEMORANDUM OF POINTS AND AUTHORITIES

PRELIMINARY STATEMENT

In 2012, Plaintiff's predecessor, and later Plaintiff, began selling Tequila under the name "Tequila 512." The name refers to the area code of Austin, Texas, where Tequila 512 is based, and "512" is Plaintiff's federally registered trademark. Plaintiff markets Tequila 512 using not only the name but its distinctive trade dress and design – featuring the name "512" in black (with a hand painted look) surrounded by a yellow rectangle. Tequila 512 has been marketed and sold continuously since its initial launch, and is currently marketed and sold in Texas, California, Florida, New York and several other states. In the past two years, Plaintiff has spent over $2.5 million marketing Tequila 512, with plans to expand sales across the nation.

In 2021, Defendant began selling a directly competing tequila. Rather than create its own brand and label, however, Defendant chose a name and branding extremely similar to Plaintiff's. Like Plaintiff, Defendant chose an iconic area code as the name (818), and features their name in a black hand-painted look surrounded by a yellow rectangle. The similarity between the two marks is unmistakable:

 As the evidence set forth in this Opposition demonstrates, Defendant's use of a confusingly similar mark and trade dress has resulted in massive consumer confusion about the source, sponsorship, and affiliation of the two products. Not only are the marks confusingly similar, but the marks are used on the very same product (tequila), greatly increasing the likelihood of consumer confusion. Plaintiff's sales representatives face this very real and troublesome confusion virtually every day, as they attest in their declarations.

The Ninth Circuit evaluates likelihood of confusion in a trademark case by balancing the eight likelihood of confusion factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). But as many cases have recognized, the issue of

likelihood of confusion is an inherently highly factual and subjective matter, rarely appropriate for summary judgment. That is certainly the case here. As shown below all of the *Sleekcraft* factors favor Plaintiff, and Defendant's motion fails on the law. To the extent Defendant's evidence raises factual issues about one or more factors, Defendant's motion fails as a result of those factual issues.

Defendant tries to buttress its motion with a purported expert survey to support its contention that there is no likelihood of consumer confusion between the two products. But as Plaintiff's expert and common sense show, Defendant's survey is so fatally flawed that it is not only of no value but likely not even admissible under the *Daubert* standard. Among other problems, the study uses an inappropriate methodology for a case like this, almost half of its interviews were tossed as being unreliable, undermining the study's credibility, and, significantly, the study failed to take into consideration the markets where the two products are actually marketed and sold. Those problems and more infect and undermine all of the study's results.

In sum, and as set forth in detail below and in the Separate Statement of Genuine Issues, this case, like the vast majority of trademark cases where likelihood of confusion is at issue, presents numerous and highly contested factual issues not appropriate for summary judgment. Defendant's motion should be denied.

STATEMENT OF FACTS

A.    <u>The Tequila 512 Trademark and Trade Dress</u>

In 2007, entrepreneur Scott Willis and his wife formed Willis Importing LLC to manufacture and sell Tequila 512. Willis Decl. ¶ 1. Willis and his wife lived in Austin, Texas and wanted the brand to have a connection to Austin, so they chose for the brand name Austin's area code, 512. *Id.* In 2008, Willis obtained trademark protection for the word mark "512" directed to "Tequila; Distilled Spirits, Spirits." *Id.*

In 2020, ClipBandits acquired Tequila 512, including its Trademark Registration for the word mark 512, directed to, among other things: "Tequila; Distilled Spirits; Spirits" (Reg. No. 4280076). Matzorkis Decl. ¶ 1. Plaintiff also has pending with

2

the Trademark Office an application for its design mark, elements of which also form part of its packaging trade dress. Valle Decl., Ex. 3.

In or around 2015, prior to the sale to ClipBandits, Willis decided to redesign the labelling for Tequila 512. Willis Decl. ¶ 2. He wanted the new packaging to continue to use the name 512. *Id.* He also wanted the new design to be simple and clear, and to evoke a connection with Tequila and Austin but without being too local in its imagery. *Id.* That is, he wanted to avoid the "traps" that have been set for other Austin brands, including live music, cowboy boots and blithely crafted script type. *Id.*

Working with a team of designers, a new label was chosen. *Id.* at ¶ 3. The new label continued to feature the name 512 but surrounded by a yellow rectangle. *Id.* The yellow color was selected because it was reminiscent of the bright colors of Mexico, but Willis also chose a shade to be consistent with the over-all look Tequila 512 wanted to achieve. *Id.* The lettering was simple and clear as Willis wanted, but instead of looking computer-generated the printing is designed to appear like it was hand-painted. *Id.* The over-all effect is a soft, pleasing and simple look. *Id.* The name 512 is prominently featured in large script, similarly designed to look hand-painted. Tequila 512 has continuously used this mark and labelling from 2016 to the present. *Id.*

The color yellow, and in particular a yellow rectangle, is an important part of the Tequila 512 trade dress. Matzorkis Decl., ¶ 4. It features prominently in the Tequila 512 packaging and advertising, and the conspicuous Tequila 512 building at the busy corner of Mopac and Lake Austin Blvd. in Austin, Texas, is a yellow, generally

 rectangular building with black writing, accompanied by a yellow, rectangular billboard. *Id.* This yellow building and billboard have been recognized as being overtly associated with Tequila 512:

*https://www.thirtyonewhiskey.com/review-tequila-512-blanco/* ("One bottle that I've been putting off for a while is Tequila 512, but thanks to the massive billboard and location they unveiled downtown not too long ago, I simply can't ignore it any

longer."); *https://austonia.com/tequila-512-mopac-building* ("Tequila 512 finally reveals its secret plans for the iconic building at Mopac and Lake Austin Blvd.").

ClipBandits has an additional building in Austin, known as Tequila 512 Casita, which is also yellow with black writing, prominently displaying the image of a bottle of ClipBandits' Tequila 512, and has a door that is a vertical yellow rectangle:



*Id.* at ¶ 6. See also the information appearing at *https://withbutler.com/work/tequila-512*, which is incorporated herein by reference. See also *https://www.thirtyonewhiskey.com/review-tequila-512-blanco/* ("There's a big yellow bar down the front that acts as the brand identity and lets you clearly identify it on the back bar, and the brand name is arranged in block letters on the front as if stamped onto the bottle."); *see also* the Tequila 512 website *https://tequila512.com/* and online shop: *https://shop.tequila512.com/collections/all*, incorporated herein by reference. ClipBandits' marketing, including but not limited to paddleboards, shirts, cups, etc., is focused on the color yellow and, where applicable, black printing on such yellow.

B.  Tequila 512's Markets

In 2020, when Plaintiff acquired Tequila 512, the company marketed its tequila in Texas and Arkansas. *Id.* at ¶ 8. Austin has always been the base location of Tequila 512 and where its name recognition is the strongest. *Id.* However, once Plaintiff acquired Tequila 512, it invested substantial sums of money in marketing Tequila 512 not only in its existing markets but in new markets across the country. *Id.*

In 2020, Plaintiff began selling Tequila 512 in California and shortly thereafter in Florida and Hawaii. *Id.* at ¶ 9. Tequila 512 is now sold not only in Texas, California, Florida and Hawaii, but also in New York, Washington, New Jersey, Alaska and Puerto Rico. *Id.* And it is implementing plans, at substantial expense, to expand the marketing and sale of Tequila 512 across the entire nation. *Id.* The marketing of the Tequila 512 brand from state to state as it expands is part of an overall plan to create

4

a national and ultimately global brand. *Id.* Tequila 512's distinctive trademark and trade dress are central to the future success of Plaintiff's business. *Id.*

Plaintiff's marketing efforts have included: online marketing, trade events, providing product samples, tasting events, and a team of sales managers focusing on specific markets to promote, market and sell Tequila 512 through, among other things, distributors, retailers and hosting and sponsoring events in the relevant markets. *Id.* at ¶ 10. In the past two years Plaintiff has spent more than $2.5 million marketing and promoting the Tequila 512 brand. *Id.* As a result of its distinctive brand, its substantial marketing efforts, and the quality of its product, Tequila 512 has been lauded for its high quality tequila, including winning the coveted "Double Gold" and "Best in Show" awards at the San Francisco World Spirits Competition. *Id.* at ¶ 11.

Tequila 512 and its design are strong marks, particularly recognized in Austin and the other markets where the product has been sold for some time. *Id.* at ¶ 12. While public recognition of the marks is less in new markets or markets where Tequila 512 has not yet been sold or marketed, that recognition, along with the strength of the marks, is growing over time as Plaintiff expands its markets and marketing. *Id.*

C.      818 Tequila's Infringement

In 2021, Defendant launched a competing tequila. *Id.* at ¶ 13. But instead of creating its own distinctive brand, Defendant created a brand and label that is shockingly similar to the Tequila 512 brand. *Id.* As shown in the photograph on page 1, side by side, the similarities are unmistakable.

In particular, out of the entire world of naming options open to it, Defendant chose a 3-digit brand name with a central 1 that, like Plaintiff's 512, is a prominent area code. And out of the entire world of colors and shapes to use for product design, Defendant chose to copy Plaintiff's distinctive black lettering inside a vertical yellow rectangle that has acquired so much goodwill over the years. Rather than trying to compete on their own merits, Defendant simply used Tequila 512's marks, hoping to obtain Plaintiff's customers as a ready-made customer base by deceiving them into

falsely believing Defendant's 818 Tequila is another product sold by Tequila 512, or has some other affiliation with Plaintiff. Comparing the two products, customers would easily believe, incorrectly, that the products are related. *Id.* at ¶ 14.

In addition, 818 Tequila used the very same distillery in Mexico, La Cofradia distillery, that Tequila 512 has used for years. *Id.* at ¶ 17. Tequila 512 bottles have always been displayed prominently at the distillery and would be visible to anyone who visits. Willis Decl. ¶ 4; Matzorkis Decl. ¶ 17, and Exs. 3 and 4 (pictures of Tequila 512 bottles on display at the distillery). Presumably, Defendant did not launch its 818 Tequila without first visiting the manufacturing distillery.

D.     Marketplace Confusion

Defendant's suggestion that there is no likelihood of confusion between the two brands is inconsistent with Plaintiff's experience in the markets where it operates. Plaintiff has a Senior Vice President of Sales, Brittany Luna, who supervises a team of Sales Managers with responsibility for various regions around the country. Matzorkis Decl. ¶ 19. As the accompanying declarations show, Tequila 512's customers are regularly confused about the source or affiliation of the two brands. *Id.* Even retailers, who are presumably more discriminating than consumers at a retail establishment, regularly confuse Tequila 512 with 818 Tequila, informing Plaintiff's sales representatives that they don't want to carry the "Jenner brand," they don't like celebrity-backed alcohol brands, they have already tried 818 and it is terrible, and other examples that reveal confusion about the source of the two brands. *See* Butland Decl. ¶¶ 2-4; Gochis Decl. ¶¶ 3-5; Grant Decl. ¶¶ 3-7; Luna Decl. ¶¶ 3-6; Nosal Decl. ¶¶ 3-6. Moreover, as these declarants state, these are not "one-off" instances but occur virtually every day they are out in the market. *Id.*

ARGUMENT

1.     Summary Judgment Is Disfavored In Trademark Cases Because Likelihood Of Confusion Is A Highly Factual And Subjective Question

As countless cases recognize, the issue of likelihood of confusion presented by

6

the eight *Sleekcraft* factors is inherently highly factual and subjective, and rarely appropriate for summary judgment. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (*"Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena."*)

As shown below, the present case is no exception to this rule. If anything, *all* of the *Sleekcraft* factors favor Plaintiff, and thus Defendant's motion fails because there is very clearly a likelihood of confusion in this case. But even if room exists in some of the factors that would allow a jury to potentially find likelihood of confusion, it remains that the factual and evidentiary disputes involved, and the overall balancing of the disputed factors, must be left to a jury, which plainly could find likelihood of confusion on this record. Summary judgment should therefore be denied.

2.   <u>Summary Judgment Should Be Denied Because The *Sleekcraft* Factors All Favor Plaintiff, Or At A Minimum Are Riddled With Factual Issues Requiring A Jury To Decide The Issue Of Likelihood Of Confusion</u>

    A.   <u>Defendant Concedes, As It Must, That 3 Of The 8 Sleekcraft Factors – Proximity Of Goods, Marketing And Distribution Channels, And Likelihood Of Expansion Of Product Lines – Factually Favor Plaintiff</u>

On pages 20-21 of its Opening Brief, Defendant essentially concedes – or at least does not contest – that three of the eight *Sleekcraft* factors, namely Proximity of the Goods, Marketing and Distribution, and Likelihood of Expansion of Product Lines, support Plaintiff and not Defendant. Nor could Defendant contend otherwise – both products are tequilas that come in three varieties, and that are sold in the same types of stores at roughly similar price points to the same types of consumers. Matzorkis Decl. ¶ 18. And, having similar and directly competing products at present, both companies have the same incentives and abilities to branch into the same types of new product lines if they chose to.

Hoping to deflect this substantial head start on the *Sleekcraft* factors, Defendant argues that these *Sleekcraft* factors can be less relevant than others if the other

7

factors favor the junior mark. But they are indeed relevant – we would not be here if Defendant sold computers using Defendant's imitation of Plaintiff's mark, but instead it is the same product, tequila, sold in the same places, to the same customer base, using a name and design that have caused, and continue to cause, substantial actual confusion in the marketplace. While the conceded factors alone would not carry the day if most or all other factors were to unambiguously point toward Defendant, as shown in the following sections, the remaining factors substantially favor Plaintiff as well, or at a minimum raise numerous factual issues that need to be determined by a jury. Accordingly, summary judgment is inappropriate.

> B. The "Similarity Of The Marks" Factor Also Favors Plaintiff, Or At Least Raises Factual Issues To Be Decided By A Jury

There are two marks and a trade dress at issue in this case:

-- the registered word mark "512" (infringed by Defendant's "818" on all three varieties of its tequila);

-- the design mark consisting of a vertical yellow rectangle with black block text having a hand-painted look inside saying "Tequila 512" (infringed by Defendant's vertical yellow rectangle with black block text having a hand-painted look inside saying "818 Tequila" on its Blanco variety); and

-- the packaging trade dress of the overall look of Plaintiff's tequila bottles characterized primarily by the prominent use of a vertical yellow rectangle with black block text having a hand-painted look of the design mark (infringed by the overall look and feel of Defendant's Blanco variety bottles).

As shown on page 1 above, placing Plaintiff's and Defendant's bottles next to each other shows, more than anything else, how similar they are. As part of its motion, Defendant lodged actual bottles with the Court. Plaintiff invites the Court to examine those bottles, which show – even apart from any other analysis or fact – that the question of similarity of the marks points decidedly in favor of Plaintiff. (Plaintiff's Statement of Genuine Disputes No. 46, hereinafter referenced as "DF XX").

Both bottles use a vertical yellow rectangle with black block text having a hand-painted look and a prominent 3-digit number with a 1 in the middle, recognizable as the area code of a prominent city. That distinctive and easily recognizable combination presents the same commercial impression to consumers. At a minimum, the striking similarity presents a fact question for the jury.  DF 48.

Defendant does not, and cannot, cite any case granting summary judgment on the issue of no likelihood of similarity as a matter of law for directly competing products involving any marks as similar as those here: vertical yellow rectangle with black block text having a hand-painted look and similar brand names (area codes of the form X1X). This issue belongs to the jury.

But the similarity does not stop with the overt similarity of the labels. Rather, of all the possibilities of bottle shapes that Defendant could have chosen, it chose a bottle that, viewed from the front, has a similar (though not identical) profile to Plaintiff's bottles – colorless, long rise, rounded shoulders, long thin neck, with a vertical label that takes up most of the front space of the bottle while leaving a gap at the bottom larger than the gap at the top. Defendant did not have to choose that bottle – tequila bottles come in an extremely wide variety of configurations, a small sample of which appears in this online "Beginner's Guide To Tequila":

 (Source:     https://la-mesa.com/drinks/beginners-guide-tequila) By putting its infringing label on a bottle with a similar profile to Plaintiff's, Defendant copies not only the label itself, but the overall look and feel of Plaintiff's Tequila 512.

In addition, although the design mark and trade dress cover infringement by Defendant's Blanco variety – the only one of its varieties to use a yellow rectangle – Defendant's other two varieties (Reposado and Añejo) infringe Plaintiff's trademark by virtue of their "818" name alone. In 2013, Plaintiff's predecessor secured the federally registered trademark "512" for "Tequila; Distilled Spirits; Spirits." The 512

mark represents a famous area code – that of Austin, Texas, where Plaintiff's headquarters are located. Matzorkis Decl., ¶ 2. By virtue of the federal registration, Plaintiff has national rights in that mark throughout the United States for "Tequila; Distilled Spirits; Spirits," and can protect that mark against confusingly similar uses.

Defendant's "818" brand is one such confusingly similar use. Like 512, it is a prominent area code, and the cadences of the names are very similar when spoken, with the same number of syllables and the middle digit being identical: "five-one-two" versus "eight-one-eight." It is easy to see how consumers would be confused into believing that the brands were associated. Matzorkis Decl., ¶ 14.

In determining likelihood of confusion, a factfinder must consider not only the look and sound of the marks, but also their meanings. Accordingly, the mark TORNADO was confusingly similar to CYCLONE as used on wire fencing:

> In determining likelihood of confusion between marks on identical goods, it is proper to consider their appearance, sound and meaning. Clearly the involved marks "Tornado" and "Cyclone" do not look or sound alike. But a combination of all three factors need not necessarily exist, and an opposition to registration may be sustained if the marks are identical or so similar in meaning that confusion as to origin is deemed likely.

*Hancock v. American Steel & Wire Co. of New Jersey*, 203 F.2d 737, 740 (C.C.P.A. 1953) (citations omitted). In similar fashion, 512 and 818 are very similar in meaning because they are both well-known area codes. And they are far more similar in sight and sound that CYCLONE and TORNADO. They are confusingly similar, but even if there is room for disagreement, certainly a jury could reasonably conclude they are confusingly similar, and summary judgment should be denied. *See also American Technical Industries, Inc. v. General Foam Plastics Corp.*, 200 U.S.P.Q. 244, 1978 WL 21727 at *3 (S.D.N.Y.1978) ("the trademarks "Mountain King" and "Alpine Emperor" convey a similarity of meaning which may very likely confuse the public as to the source of the product").

Defendant has not cited any authority that calls the above analysis into question. Defendant cites, for example, a Trademark Appeals Board finding based on the dissimilarity of a single uniform color of an entire product attempted to be used as mark. *In Re Medline Indus., Inc.*, No. 87680078, 2020 WL 1485709, at *16 (Mar. 25, 2020) That, like the other cases cited by Plaintiff, has no bearing on whether there is a *question of fact at the summary judgment stage* to be resolved by a jury assessing identical and directly competing products that appear similar based on a *combination* of factors – here, a vertical yellow rectangle with black block text having a hand-painted look, and a similar word mark.

Similarly, Defendant's string cite of cases for the proposition that "Where the two marks are entirely dissimilar, there is no likelihood of confusion" (*Brookfield Commc'n Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999)) or "because these marks are 'dramatically different,' there is no likelihood of confusion" (*One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1165 (9th Cir. 2009)) does not apply here, where the marks at issue are in no way "entirely dissimilar," but instead are so strikingly similar it looks like one was based on the other. No other tequila on the market shares the striking similarity that the 512 and 818 bottles do.

Accordingly, the similarity of the marks at issue is a question for the jury, and summary judgment should be denied.

C.   The "Actual Confusion" Factor Also Favors Plaintiff, Or At Least Raises Factual Issues To Be Decided By A Jury

Simply looking at the similarity between the Blanco bottles as depicted in the previous section, it is easy to see how customers were confused when 818 introduced its bottles years after 512 had been on the market. It was that confusion – customers expressing to 512 or 512's distributors and retailers confusion over 512's involvement with the 818 brand – that prompted this lawsuit. In particular, Plaintiff has submitted all of the following instances of actual confusion, and many more:

-- I was at the festival for 20 hours over the two days. I would estimate that at

11

least three people every single hour came up to me expressing confusion between Tequila 512 and 818 Tequila. Consumers said, among other things: "I've wanted to try this, it's Kendall Jenner's tequila, right?" "Are you Kendall Jenner's tequila?" "You are Kendall Jenner's tequila!" (Butland Dec. ¶ 4)

-- In June 2022, when I was attempting to sell Tequila 512 to the Mauna Loa liquor store in San Francisco, the purchaser, Kurt, refused to buy it, telling me "he already carried it and people don't like it." I had to persuade him that Tequila 512 was not 818 Tequila and has no connection with any celebrity backing in order to get him to consider making the purchase. (Grant Decl. ¶ 3)

-- On October 4, 2022, I was talking to a buyer in Washington, Theresa, for QFC.  When I brought out Tequila 512, the buyer immediately asked me if this was the new version of 818 Tequila, requiring me to explain that we have no affiliation with 818 Tequila. A few weeks ago, when I was seeking to sell Tequila 512 to a buyer for Pint and Cork in Maui, Hawaii, the buyer, Ryan, told me we don't do celebrity brands. Again I had to explain that we have no affiliate with 818 Tequila and are not a celebrity-backed brand. (Nosal Decl. ¶¶ 4-5)

For *many additional instances* of actual confusion in the record, easily raising at least a factual dispute, *see* DF 46.

This evidence of substantial actual confusion already having taken place means this factor points strongly toward Plaintiff. "Evidence that use of the two marks has already led to confusion is ***persuasive proof that future confusion is likely***." *Sleek-craft*, 599 F.2d at 352 (emphasis added). Here, real customers are being actively confused by Defendant's branding every day, and Plaintiff is being injured by, and having to deal with the fallout of, that confusion every day. And where, as here, the second user causes actual confusion shortly after entering the market, such instances of actual confusion are particularly significant. *See, e.g., The Sherwin–Williams Company v. JP International Hardware, Inc.*, 988 F.Supp.2d 815, 819 (N.D.Ohio 2013) ("Most importantly for the likelihood of confusion analysis, Sherwin–Williams has

1  provided evidence of actual confusion, even though PERFECT-branded paint

2  brushes have only been sold in the marketplace for a very short time. *Wynn Oil Co.*

3  *v. Thomas*, 839 F.2d 1183, 1188 (6th Cir.1988) ("Evidence of actual confusion is

4  undoubtedly the best evidence of likelihood of confusion.")").

5  In a misguided attempt to avoid the plain and unsurprising existence of actual

6  confusion and the result it entails, Defendant has submitted an expert report from Dr.

7  Michael Kamins based on a survey he conducted. Lee Decl., Ex. A.  In that report,

8  Kamins describes a survey in which he showed people a bottle of 818 Tequila and

9  asked them what other brands come to mind. When people did not mention 512, Ka-

10  mins concluded that people were not generally confused. While a properly conducted

11  survey, in appropriate instances, can be relevant to the actual confusion factor, a

12  flawed survey adds no enlightenment but instead misleads, as is the case here. DF 47.

13  Kamins's survey is precisely the wrong type of survey to show confusion as to

14  a brand that does not have widespread recognition in the location the survey was

15  conducted. DF 47. For example, no one from Ohio would be expected to mention the

16  brand 512, because 512 does not distribute in Ohio (and, similarly, most other states).

17  On the other hand, if Kamins's survey had been conducted in Austin – where 512 is

18  well-known – many instances of confusion would be expected. Matzorkis Decl., ¶

19  12. There is no evidence at all that the respondents counted in Kamins study were, as

20  a group, aware of the 512 brand and thus, Kamins's report establishes nothing more

21  than had he conducted the same survey in Lithuania and tried to draw any conclusions

22  from the fact that no one mentioned 512.[1]

23

24

----

25  [1] Kamins tries to paper over this fatal flaw by suggesting that his methodology was
appropriate because Plaintiff's complaint alleges "Plaintiff sells a popular tequila in
26  the United States under the brand name 512, using a highly distinctive logo and color
scheme that has been in place since 2015" and similar language. (Kamins Report ¶ 5.)
27  But Kamins confuses the strength of a mark with the widespread recognition of a
mark. The 512 marks are strong because they are arbitrary marks as applied to tequila
28  and are well-known and highly recognizable by tequila drinkers in the limited areas

13

Another fatal flaw is that the survey was done remotely on people's own computers with no supervision: "The program was prepared to enable respondents to easily complete the survey using a desktop computer, a laptop computer, or a tablet." (Lee Decl., Ex. A (Kamins Report) at ¶ 50.) But it is well-known that colors on computers can vary substantially from how they appear in real life. (*See, e.g., Why Do Colors Look Different on Computer Monitors & Screens*?, https://www.qualitylogo-products.com/promo-university/why-monitors-display-different-colors.htm;   *Showing Your True Colors: Why Colors Look Different on Screen vs. In Print*, *https://www.mcnuttpartners.com/showing-your-true-colors-why-colors-look-different-on-screen-vs-in-print/).* Kamins' report does indicate that any steps were taken to ensure a survey taker's computer and ambient lighting conditions accurately reflected the true color of how any bottle would appear in actual marketplace conditions.

Plaintiff asked its own expert with more than 30 years of experience, Sarah Parikh, to review the Kamins report. Valle Decl., Ex. 6. A thorough examination of the report, and why it grossly fails on its face for the above reasons and others, is set forth in the Parikh Report. *Id.;* DF 47.  Of particular note are the following matters:

-- The use of the Eveready methodology was inappropriate for both the Forward and Reverse Confusion Surveys as there is insufficient evidence that either party's mark is well-recognized on a national basis.

-- The national scope of the surveys was overly broad, and failed to represent the overlapping geographic territory served by both parties.

-- The samples were not representative of the target population, and there are significant differences in the demographic characteristics between test and control

---

in which the 512 marks have been sold for years. Regardless of strength and recognition in some geographic areas, the 512 marks are not currently well-known in most areas of the United States, since they have not been sold or advertised there. Kamins cannot take – or at least should not have taken – a survey designed to test likelihood of confusion that would apply only to a mark well-known to the actual survey respondents, and test it in locations where that mark does not have the degree of consumer recognition needed to make that methodology sensible.

cells.

    -- The control stimuli in both surveys were improper and failed to isolate the trademark and trade dress elements at issue.

    -- By keeping the image of the tequila in front of the respondent while they were answering the questions, the Kamins Surveys were really nothing more than reading tests in which respondents just parroted back what they were looking at.

    -- It is unclear what role Dr. Kamins actually played in this matter, as he appears not to have been that involved in designing, supervising or analyzing his two surveys. Instead, by his own admission, Defendant's counsel selected and retained Spectrum Associates, a research firm, who co-authored the questionnaire, programmed the survey, oversaw the data collection, and analyzed the results. And Defendant's counsel, rather than Dr. Kamins, tested the survey program.

    -- According to the Kamins Report, nearly half of the qualified interviews were discarded due to alleged quality control issues. This is a high percentage of "bad" surveys and calls into question the integrity of the data in general.

    -- Contrary to customary practice Dr. Kamins did not supply the underlying data from his surveys with the initial report (or by the time Dr. Parikh finished her report), without which it is impossible to evaluate the quality of the data and the accuracy of his reported conclusions.[2]

(Valle Decl., Ex. 6 (Parikh Report) at ¶ 12). Dr. Parikh examines these matters in greater detail in her rebuttal report, showing that no reliable conclusions about customer confusion can be draw from the Kamins Report.

---

[2] Defendant produced the Kamins data file three days after filing their motion and about one hour *after* Dr. Parikh had completed and signed her rebuttal report, so at the time she provided her report to Plaintiff she did not have access to the Kamins data file, which might provide grounds for additional critiques.  Valle Decl., Exs. 4 and 5.

In sum, Plaintiff has submitted substantial evidence of actual confusion, actually occurring in the marketplace. Defendant's survey attempting to show lack of confusion fails for reasons thoroughly discredited above and in the Parikh report. This "Actual Confusion" *Sleekcraft* factor points decidedly in Plaintiff's favor. And if there is any doubt, it at most raises a question of fact that should be decided by a jury, and that cannot support summary judgment in favor of Defendant.

D.   The "Strength Of The Mark" Factor Also Favors Plaintiff, Or At Least Raises Factual Issues To Be Decided By A Jury

> Stronger marks receive greater protection. Both *conceptual strength* and *commercial strength* inform the degree of trademark protection a mark receives. Conceptual strength measures the inherent distinctiveness of a mark along a spectrum. Generic and descriptive marks receive less protection than suggestive marks, and fanciful marks receive the greatest protection. Commercial strength refers to the strength of the mark in the marketplace, which can be established by advertising expenditures and sales data.

*Michael Kors, LLC v. Chunma USA, Inc*., 2018 WL 1426539, at *3 (C.D. Cal. Jan. 30, 2018) (emphasis added).

In the present case, Plaintiff's marks are strong in the markets in which they are sold. DF 50. Plaintiff's predecessor obtained a federal registration of its 512 mark in 2013, and that mark has been used – exclusively – for tequila continuously since then. Matzorkis Decl., Ex. 1. The number 512 does not describe any particular quality or characteristic of tequila, and thus is an arbitrary and therefore *conceptually strong* mark as to tequila. *See, e.g., Jordache Enterprises, Inc. v. Levi Strauss & Co*., 841 F. Supp. 506, 522 (S.D.N.Y. 1993) ("As the ordinary meaning of the numeral "501" does not describe any particular quality or characteristic of jeans or jean apparel, the "501" trademark is conceptually strong when applied to such products."); *Michael Kors,* 2018 WL 1426539, at *3  ("The MK trademark is conceptually strong. While it does represent the initials of Michael Kors, the designer, the MK mark does not in any way describe the products themselves."); *YKK Corp. v. Jungwoo Zipper Co., Ltd*., 213 F. Supp. 2d 1195, 1200 (C.D. Cal. 2002) (finding that the "YKK" trademark

was "extremely strong" because it represented the original company's initials and did not describe the company's products); DF 49.[3]

In July 2021, Plaintiff applied for a registration of its design mark. Defendant notes that the USPTO has issued a Final Office Action against the application, but Defendant fails to mention is that the Final Office Action was directed **solely** to the inclusion of the word "Tequila" in the mark without submission of a consent from the holder of the certification mark for TEQUILA. The USPTO indicated that the registration will be granted if a consent from the TEQUILA mark holder is submitted:

> The examining attorney notes that the record of these registrations shows that each of the registrants includes a consent to registration from the owner of the cited geographic certification mark. To be accepted, the statement must provide consent to registration, not just the right to use the mark. An authorization to use and register coupled with a disclaimer of the exclusive right to use the geographic designation generally is sufficient to obviate a Section 2(d) refusal.

(Valle Decl. ¶ 10, Ex. 7.) Accordingly, the *design* of the design mark is perfectly registrable, as the only thing holding up registration is a written consent to the word TEQUILA from the TEQUILA certification mark holder, which Plaintiff is seeking. And Plaintiff has been using that design mark continuously and exclusively since 2016, with the sole exception of Defendant's infringing mark first used in 2021. Willis Decl., ¶ 3. Plaintiff's design mark is strong.  DF 50.

The name 512 and the design elements of a vertical yellow rectangle with black block text having a hand-painted look are completely arbitrary as used in connection with tequila, and thus are inherently strong marks when used in connection with tequila. Moreover, as to the yellow rectangle strongly associated with Plaintiff's tequila, Plaintiff has reinforced its association with yellow in several ways, including

---

[3] Accordingly, Defendant's citation to cases showing that merely *descriptive* marks can be conceptually weak is irrelevant. *See, e.g., Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107, 1118 (N.D. Cal. 2010) ("Here, there is no dispute that Sand Hill can be construed to mean that Plaintiff is an advisory firm based in the Sand Hill area").

17

the color of its headquarters, its Austin-based Casita 512 house, and the predominant color of its merchandise items (which also include black printing, where appropriate). (*See* pages 3-4, above.) The main graphic on the 512 website is also a yellow rectangle with black printing. *See http://www.tequila512.com.*

As shown in the block quote at the start of this section, the conceptual strength of a mark can be increased by advertising expenditures, which help establish the marketplace strength of a mark in locations where the mark is advertised and sold. Here, Plaintiff has spent more than $2.5 million on advertising and marketing its products in just the past two years. Matzorkis Decl., ¶ 10.

Similarly, awards and other publicity for a brand also contribute to the strength of a mark. *George Sink, P.A. Inj. Lawyers v. George Sink II L. Firm, LLC,* 407 F. Supp. 3d 539, 555 (D.S.C. 2019) ("There is also plenty of evidence of un-solicited media coverage of Sink P.A., including news articles, social media posts, and awards for Best Law Firm from The State newspaper. Based on the foregoing, the court finds that plaintiff's mark has significant commercial strength.") Here, Plaintiff has won major awards, including the coveted "Double Gold" and "Best in Show" awards at the San Francisco World Spirits Competition. Matzorkis Decl., ¶ 11. And 512 is constantly the subject of substantial additional publicity as well, two articles of which – expressly discussing Plaintiff's iconic design elements – have already been discussed.

For all these reasons, Plaintiff has made a strong showing of the strength of its marks.

Defendant argues (Opening Brief at 25-26) that "512's Trade Dress Is Neither Inherently Distinctive Nor Has Secondary Meaning," which is not the same thing as strength of the design mark (since inherently distinctive marks, or marks that acquire distinctiveness, can be strong or weak, and it is not clear that, by trade dress, Defendant is referring to the design mark). But a design such as the vertical yellow rectangle with black block text having a hand-painted look is an inherently distinctive mark. As one of the cases Defendant itself cites holds:

18

A design used in conjunction with other marks is separately protectable in its own right if it creates a separate and distinct impression from the impression created by the other marks. This will be true if either the mark is itself inherently distinctive, *see, e.g., In re Servotronics, Inc.*, 156 U.S.P.Q. 592, 592 (T.T.A.B.1968) (holding stylized letter "S" separately protectable from word in which it appeared); *In re W.B. Roddenbery Co.*, 135 U.S.P.Q. 215, 216 (T.T.A.B.1962) (holding combination of gold circle and colored rectangle, utilized as background to applicant's advertisement for sour pickles, registrable separately from foreground elements), or if the consuming public has come to associate the separate mark in itself with the particular product, vesting it with its own distinct secondary meaning, see Restatement (Third) of Unfair Competition § 13 cmt. d.

*Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir. 2005).

In the present case, there is no need to resort to acquired secondary meaning, because the design of a vertical yellow rectangle with black block text having a hand-painted look is inherently distinctive. *See, e.g., In re Forney Indus.*, 955 F.3d 940, 945 (Fed. Cir. 2020) ("a distinct color-based product packaging mark can indicate the source of the goods to a consumer, and, therefore, can be inherently distinctive."); *McCarthy on Trademarks and Unfair Competition* § 7:45 (5th ed.) (where color is confined to or creates a defined design, it can be inherently distinctive).

Moreover, although no evidence of secondary meaning is needed here, it is clear that the marketplace recognizes Plaintiff's vertical yellow rectangle with black block text having a hand-painted look as indicative of Plaintiff's tequilas. Plaintiff used that design, exclusively as to all others, for years until Defendant copied it for its Blanco bottles. And as discussed above Plaintiff's iconic marking has specifically been called out online as brand-identifying: "There's a big yellow bar down the front that acts as the brand identity and lets you clearly identify it on the back bar, and the brand name is arranged in block letters on the front as if stamped onto the bottle." (https://www.thirtyonewhiskey.com/review-tequila-512-blanco). *See also* https://austonia.com/tequila-512-mopac-building (referring to Plaintiff's "big yellow building" in 2021 as "iconic" and quoting one of Plaintiff's principals as stating "This

building is here to be that physical representation of those brands") If evidence of secondary meaning were needed as to the trade dress (which it is not), this provides it. At a very minimum, it raises an issue of fact that precludes summary judgment.[4]

As to the 512 word mark, Plaintiff argues that other tequila companies use numbers in their names, but then goes on to identify primarily tequilas that use numbers as part of their names, along with one or more other words, such as Avion Reserva 44 Tequila or Corralejo 1821 Tequila. If Defendant wants to clearly add a house name to its 818 brand to distinguish it from 512, Plaintiff would have no quarrel with that new and different word mark. The only tequila that Defendant lists as having solely a number as its brand with no words other than tequila is 1800 Tequila, but conceptually 1800 is a date, and would not remotely be confused with 512 which is an area code. Similarly, if Defendant wanted to change its branding to a Los Angeles Zip Code such as 90210, again Plaintiff would have no objection to that word mark. And Defendant's reference to the fact that some ***non-tequilas*** use area codes as brands is irrelevant. A brand has a greater scope of protection against similar uses by the same types of products – here, tequilas – so what non-tequilas might do is unimportant.

Finally, even if there is any merit to the Defendant's arguments as to strength

___

[4] Indeed, one of Defendant's cases directly supports Plaintiff in this regard. On page 26, Defendant cites *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987), which found for a defendant because "Carbide did not attempt to engender consumer identification with the yellow, F-style jug. It did not, for example, urge consumers to look for the 'familiar yellow jug.'" But, as shown above, Plaintiff ***has*** taken substantial steps to have consumers associate its brand with its vertical yellow rectangle with black block text having a hand-painted look. And Plaintiff has been so successful in doing so that, as discussed, its branding has specifically been called out as brand-identifying. Moreover, Plaintiff's evidence of actual confusion, discussed above in Section 2.C, is also evidence of secondary meaning, since without secondary meaning, consumers would not be confused. *See, e.g., Lanard Toys Ltd. v. Novelty Inc.*, 511 F.Supp.2d 1020, 1041 (C.D.Cal.2007) ("validity and strength of secondary meaning may be proved by evidence of actual confusion," and "this evidence is sufficient to create a genuine issue of material fact as to secondary meaning")

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

of the marks, there is plainly at a minimum a factual dispute as to this factor.

E. The "Sophistication Of Purchasers" Factor Also Favors Plaintiff, Or At Least Raises Factual Issues To Be Decided By A Jury

The standard used to assess the likelihood of confusion is "the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. Although this standard may exclude the "wholly indifferent," it "includes the ignorant and the credulous." *Id.*

Defendant misses the point when it states (without evidence) that customers will use a high degree of care when making tequila purchasing decisions. A customer purchasing tequila is not going to do substantial research, or spend substantial time, picking out a tequila, the way they would for expensive business purchases such as annual display ads. *See, e.g.*, *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir.1993) ("Advertisements are costly, depending upon the size of the advertisement and the publication. OAG's display ads cost from $2,400 to $16,000 annually. The district court found that great care is taken to insure that advertisements are accurate and are placed in the proper directory."); DF 51; Matzorkis Decl. ¶ 18. Rather, if a customer liked that tequila with the yellow rectangular label with a black-font area code last week and wants to buy it again, they can easily mistake one product for the other based on the labels. At a liquor store or supermarket, there is generally no time or inclination to do substantial investigation to make sure that the bottle you pick up is the right one, as opposed to one that looks confusingly similar. *See, e.g., Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F.Supp.2d 965, 981-82 (N.D.Cal. 2006) (granting preliminary injunction, in part because: "consumers, in selecting wine, are much more concerned with the distinctive design of the wine label" than other textual material, and "plaintiff is likely to show that the ordinary degree of care exercised by typical wine purchasers will not lead these purchasers to verify the source of the wine by reading the reverse side of the Marilyn Monroe label. This factor therefore favors plaintiff.")

Courts recognize this, and readily find that, with respect to moderately priced

alcohols of the same type, this factor points toward the plaintiff:

> Plaintiff's evidence shows that the parties are selling liquor between $45 to $55. (Declaration of Ray Ramos ¶¶ 9,12.) Further, vodka and tequila are often sold at lower price points, suggesting that the buyer of vodka and tequila is less sophisticated. *See Palm Bay Imports, Inc.*, 396 F.3d at 1376. The Court finds that purchasers of Plaintiff's and Defendant's products are less likely to exercise care in their purchase due to vodka and tequila being sold at lower price points generally, and therefore this factor weighs in favor of Plaintiff.

*Globefill Inc. v. Elements Spirits, Inc.*, 2013 WL 12109779, at *7 (C.D. Cal. 2013). And, unlike Defendant's motion, which is devoid of evidence on this issue, Plaintiff has submitted evidence that consumers would not typically expend time or effort trying to distinguish between the parties' two confusingly similar tequilas at the modest price points at which the parties' products are sold. DF 51; Matzorkis Decl. ¶ 18.

The *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373 (2d Cir 2005) case cited by Defendant on this point is wholly inapposite. Defendant notes in its Opening Brief that the *Star* court said: "Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's products, ***which are differently labeled***" (emphasis added). But the *Star* Court specifically noted that the products were differently labelled Bacardi Rum and Star Vodka products, with the complaint being over a single, stylized letter O. Of course a Bacardi Rum buyer is not likely to purchase a differently labeled Star Vodka, located in a different section or aisle, because of the presence of a single, similar-looking letter O. But *Star* has nothing to say about a purchaser being misled as to two tequilas brands (same product) when the similarity of the salient points of entire labels is at issue.[5]

---

[5] Another case cited by Defendant on this point also supports Plaintiff here. Defendant cites *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992) for the slightly paraphrased proposition that "When goods are expensive, courts assume that the "reasonably prudent consumer" will exercise greater care in their purchases." (Opening Brief at 19.) But the very next sentence of that case is: "The district court found that consumers tend to exercise less care when purchasing

F.    The "Defendant's Intent" Factor Is Neutral, And After Discovery Might Favor Plaintiff (But On Summary Judgment Cannot Favor Defendant)

A factfinder can infer intent to trade upon a senior user's mark based upon a similarity of the marks that is unlikely to be coincidence:

> Even so, the Court finds that because Defendants adopted marks nearly identical to LVSC's marks for similar services, it is clear that Defendants intended to deceive the public as to the source of the services provided. *See, e.g., CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1072 (E.D. Cal.) ("[I]ntent to derive benefit from [Plaintiff's] brand may be found in the obvious similarity between the product packaging and labeling.); *K-Swiss, Inc. v. USA AISIQI Shoes Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (drawing inference of intent to deceive based on factors including senior marks' strong reputation and the similarity in appearance of the products); *see also All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 512 (5th Cir. 2018) ("The district court correctly inferred from the striking similarity between the marks that Coalition's later mark was adopted "with the intent of deriving benefit from [Alliance].").

*Las Vegas Sands Corp. v. Xian Sheng Chen*, 2020 Wil 3452620, at *3 (D.Nev. 2020)

Here, based on the beyond-coincidental similarity of the 818 label to the 512 label, a jury may reasonably infer intent. That is enough to create an issue of fact.

Moreover, because of protracted settlement discussions, the parties have not yet exchanged any confidential discovery documents or taken any depositions, so of course Plaintiff would not yet have any *direct* evidence of intent beyond the bottles

---

lower cost items like wine and cheese, and thus rely more on brand names." *Gallo Winery*, 967 F.2d at 1293. The district court went on to find likelihood of confusion, which the appellate court affirmed. The point being, people buying items in a market or liquor store rely more on the branding than on careful consideration at the time they are making the actual purchase, and thus are more susceptible to confusion by a confusingly similar name or label, particularly when the products are exactly the same type sold in exactly the same location. And this is the very point of the *Nova Wines* case cited earlier, that consumers are more concerned with the distinctive design of the label, and are not likely to make an effort to look for distinguishing material to sort out labels that are confusingly similar.

themselves. But Plaintiff notes that although Defendant states on page 20 of its Opening Brief that "Neither Defendant nor its designer had heard of Plaintiff or its Tequila 512 when it selected "818" as its trademark or designed its bottles," Defendant only supports that statement with three declarations, each stating only what the particular declarant knew, not what Defendant as a company knew. And tellingly, Defendant does not include a declaration from Kendall Jenner (the public face of Defendant's brand) or most of Defendant's key executives and personnel. (*See* Separate Statement, No. 27). The record does not in any way preclude a jury from finding intent.

Finally, while evidence of intent points to a finding of likelihood of confusion, any absence of intent does not in any way establish the absence of a likelihood of confusion, because infringement does not require intent. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 287 (6th Cir. 1997) ("As noted, the presence of intent can constitute strong evidence of confusion. The converse of this proposition, however, is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source.") (internal quotation marks and citations omitted). Accordingly, even if all evidence and permissible inferences of intent are ignored, this factor is at most neutral.

As shown above, all of the *Sleekcraft* factors favor Plaintiff and therefore overwhelmingly establish likelihood of confusion. At most Defendant has raised a factual dispute as to some of the issues, such that perhaps a reasonable jury could find in Defendant's favor. But even so, the overwhelming state of the evidence is that a reasonable jury could much more easily find in Plaintiff's favor. And even if the factors are somehow evenly balanced, or even if some arguably tipped to some degree in Defendant's favor, factual issues abound, and the question of likelihood of confusion must be left for the jury, as is extremely typical at the summary judgment stage in trademark cases. Accordingly, summary judgment should be denied.

Faced with a record that similarly had factual issues throughout the *Sleekcraft* factors, one court expressed things exceptionally well (at pages *1-*2):

"Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002). When an issue in the case is the likelihood of confusion—a determination based on a non-exhaustive, multi-factor, fact-intensive inquiry—the Ninth Circuit has "cautioned against granting summary judgment." *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1105 (9th Cir. 2016). Indeed, "district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Thane Int'l, Inc. v. Trek Bicycle Corp*., 305 F.3d 894, 901–02 (9th Cir. 2002), superseded by statute on other grounds, 15 U.S.C. § 1125; *see Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1265 (9th Cir. 2001) ("[T]he question of likelihood of confusion is routinely submitted for jury determination as a question of fact.").

Here, there are numerous genuine disputes of material fact regarding the issue of the likelihood of confusion, including (1) the degree of marketplace recognition of Plaintiff's mark, (2) whether the FACEGYM mark is an established brand in skincare industry, and whether the FACEGYM brand is widely recognized, (3) the relatedness of the parties' goods and the marketing channels used, (4) Defendants' intent on selecting their mark, and (5) the likely degree of purchaser care. (See D. SGD ¶¶ 15–20, 24–25, 28–31, 41.) A jury will have to resolve these issues of fact to decide whether Defendants infringed Plaintiff's trademark.

*Facegym, Ltd v. Skin Gym Inc*., 2021 WL 4893273 (C.D. Cal. 2021). With even more factual disputes in the present case, a jury should resolve the issues here all the more.[6]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

Dated: October 10, 2022               VALLE MAKOFF, LLP

                               By: */s/ Jeffrey B. Valle*
                                    Jeffrey B. Valle
                                    Attorneys for Plaintiff, ClipBandits, LLC

---

[6] On pages 30-31 of its Opening Brief, Defendant states that it is making the same arguments as to Plaintiff's state-law claims as it made against Plaintiff's Lanham Act claims. Therefore, because summary judgment fails against Plaintiff's Lanham Act claims, it necessarily fails against Plaintiff's state law claims as well.

1

## **PROOF OF SERVICE**

2

3
        I declare that I am over the age of eighteen years and that I am not a party to this action. I am an employee of Valle Makoff LLP, and my business address is 11777 San Vicente Blvd., Suite 890, Los Angeles, California 90049.

4

        On the date set forth below, I served the following document(s) described as follows:

5

6
**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

7

on the interested parties in this action as follows:

8

9
   SEE ATTACHED SERVICE LIST

10

11
☒    **BY ELECTRONIC TRANSMISSION:**  Per the Court's "Electronic Filing and Service Standing Order," I caused the documents to be sent to the persons at the email addresses listed with the Court in this matter.

12

13

14

15
☐    **BY MAIL:**  I am readily familiar with the firm's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business; on this date, the above-referenced document was placed for deposit at Los Angeles, California and placed for collection and delivery following ordinary business practices.

16

17

18
☐    **BY PERSONAL SERVICE**:
      ☐   By personally delivering copies to the person served.
      ☐   I delivered such envelope by hand to the offices of the addressee pursuant to CCP § 1011.
      ☐   I caused to be delivered such envelope by hand to the offices of the addressee pursuant to CCP § 1011.

19

20

21

22
☐    **BY FED EX:**  I am readily familiar with the firm's practice for the daily collection and processing of correspondence for deliveries with the FedEx delivery service and the fact that the correspondence would be deposited with FedEx that same day in the ordinary course of business; on this date, the above-referenced document was placed for deposit at Los Angeles, California and placed for collection and delivery following ordinary business practices.

23

24
☒    *(FEDERAL)*  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

25
        Executed on October 10, 2022, at Los Angeles, California.

26
                                        */s/ Carol Tenney*

27
                                        Carol Tenney

28

1

**SERVICE LIST**

2

3      RUSS, AUGUST & KABAT                    *Attorneys for Defendant*
       Irene Y. Lee (SBN 213625)               *K & SODA, LLC d/b/a 818 SPIRITS*
4      ilee@raklaw.com
       Ashley R. Yeargan (SBN 259523)
5      ayeargan@raklaw.com
       Erica S. Kim (SBN 313261)
6      ekim@raklaw.com
       12424 Wilshire Boulevard, 12th Floor
7      Los Angeles, California 90025
       Telephone: (310) 826-7474
8      Facsimile: (310) 826-6991

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28